UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

GREGORY JAMES KNUUTTILA,

    Defendant.
_____/

Case No. 2:22-cr-15

HON. JANET T. NEFF

## **OPINION AND ORDER**

Pending before the Court are Defendant's Motion to Suppress (ECF No. 69) and Motion to Sever (ECF No. 70). The government filed responses in opposition (ECF Nos. 74 & 77), and Defendant filed replies (ECF Nos. 76 & 79). The Court held a hearing on the motions and heard testimony from Detective Sergeant Thomas Hyrkas, Deputy Detective Tyler Harju, and Trooper Andrew Peterson (ECF Nos. 80 & 81). For the reasons stated below, Defendant's motions are denied.

### **I. BACKGROUND**

In December 2019, the Upper Peninsula Substance Enforcement Team (UPSET) began investigating Defendant for drug trafficking in the Upper Peninsula of Michigan. In January 2020, a confidential informant bought methamphetamine from another individual at Defendant's house.

In September 2020, investigators suspected that Defendant and two other individuals were going on a "drug run" to Wisconsin or Minnesota to pick up a large amount of methamphetamine. Investigators tracked the vehicle, which was registered to Defendant's wife, and pulled it over as it returned to Michigan. The vehicle contained seven ounces of methamphetamine. A subsequent

search of Defendant's residence discovered scales and other electronics that were indicative of drug trafficking. Although one individual in the vehicle was charged, Defendant was not charged at the time.

In October 2020, investigators attempted to set up a controlled buy with Defendant. The confidential informant bought methamphetamine from Defendant's wife at Defendant's residence but never saw Defendant.

In July 2021, investigators pulled over another vehicle and found 2.75 ounces of methamphetamine. Although Defendant was not present in this vehicle, a passenger who was present claimed that Defendant provided money for a trip to Wisconsin to pick up the methamphetamine.

Between February 2022 and June 2022, UPSET successfully completed seven or eight controlled buys from Defendant using three separate confidential informants. During the last successful controlled buy on June 27, 2022, Defendant told the confidential informant that he was considering having him go on a drug run.

On July 6, 2022, a confidential informant met with Defendant and provided $1,500 to buy two ounces of methamphetamine. Defendant advised that he had to run out of town to get the methamphetamine and that it would happen soon. Defendant further stated that the drug run would take between 14 and 16 hours.

On July 8, 2022, the same confidential informant told investigators that Defendant's "girl," who investigators believed to be Janelle Tadgerson, was "going the next night." Tadgerson has a long history of drug use and acted as a confidential informant in 2019 to work off a drug distribution charge. Based on this information, investigators obtained a ping search warrant on Tadgerson's phone. Later that day, investigators tracked Tadgerson's phone to Iron Mountain.

They stopped the vehicle in Baraga County because they believed Tadgerson was on a drug run for Defendant.  Investigators subsequently searched Tadgerson's vehicle and found only a small quantity of fentanyl and suboxone strips for personal use.  At the time, Tadgerson had two active warrants out of Gogebic County, but the traffic stop occurred outside the 50-mile range of the warrants.

Investigators interviewed Tadgerson after the traffic stop.  Tadgerson told investigators she was supposed to go on a drug run soon with Defendant to Rhinelander, Wisconsin to pick up a large amount of methamphetamine.  She provided the name of the individual they were going to meet and explained that they might need to go to Minneapolis, Minnesota if they needed more methamphetamine.  Investigators told Tadgerson not to go on any drug run and to keep them updated on the imminent drug run.  Tadgerson also talked about acting as an informant but was not formally signed up as one.  Over the next several days, Tadgerson communicated with Detective Sergeant Thomas Hykras about possible drug runs until she blocked his phone number on July 14, 2022.

On July 9, 2022, another individual was stopped driving Defendant's vehicle and investigators believed it "spooked" Defendant and delayed the trip.  The next day, Defendant sent a text message to the confidential informant who provided the $1,500 indicating that he was still working on getting the methamphetamine.

Defendant's phone remained in the Houghton County area until July 14, 2022.  On that day, investigators tracked Defendant's phone as it traveled approximately two hours and forty-five-minutes to Rhinelander.  The phone remained in the same general area in Rhinelander for about an hour and a half before returning to the Upper Peninsula.

As soon as UPSET tracked Defendant's phone moving west from Houghton County, they made the decision to stop the vehicle as it returned to the Upper Peninsula. To effectuate the traffic stop, UPSET contacted the Hometown Security Team (HST), which is a unit of the Michigan State Police that commonly makes higher risk traffic stops. UPSET communicated the following information to Troopers Andrew Peterson and Shane Hauff of HST: (1) Defendant was recently involved in multiple controlled buys; (2) a confidential informant provided $1,500 to Defendant to buy two ounces of methamphetamine; (3) based on communications with confidential informants and past experience, investigators believed Defendant would be picking up between eight ounces to a pound of methamphetamine from a known supplier in Rhinelander or Minnesota; (4) based on communications with confidential informants, the suspected drug run was imminent; (5) Defendant's phone was tracked from Houghton County to Rhinelander where it remained for a short duration; and (6) confidential informants reported that Defendant had been carrying a gun recently.

Investigators continued to track the phone and watched it stop at a casino in Watersmeet. In the casino parking lot, investigators identified Defendant as the individual driving the vehicle and Tadgerson as the passenger. UPSET then informed Trooper Peterson that Tadgerson had outstanding warrants out of Gogebic County. Trooper Peterson ran Tadgerson through the Law Enforcement Information Network (LEIN) and confirmed the outstanding 50-mile radius warrants for Tadgerson.

At approximately 8:52 p.m., Troopers Peterson and Hauff pulled over Defendant's vehicle about 47 miles from the Gogebic County Jail. Trooper Peterson approached the driver side of the vehicle and informed Defendant that he pulled the car over because it crossed the fog line. He then started to ask his standard five questions that he asks during every traffic stop. He requested

Defendant's license and registration, but Defendant and Tadgerson could not produce the registration. Trooper Peterson then asked Defendant to exit the vehicle. Defendant initially refused but eventually got out. Trooper Peterson asked Defendant where he was coming from, and Defendant said the casino in Watersmeet but never mentioned Rhinelander. Defendant later said they had not been anywhere else beside the casino and a gas station, which Trooper Peterson knew to be untrue. As Trooper Peterson was talking to Defendant, Trooper Hauff immediately approached Tadgerson and asked for her name. Tadgerson refused and Trooper Hauff told her that they knew who she was and that they knew she had outstanding warrants.

Trooper Peterson returned to his squad car and ran the vehicle, Defendant, and Tadgerson (again) through LEIN. He also called for the K-9 unit, which arrived almost immediately. Approximately ten minutes after the initial stop, the K-9 alerted to the presence of narcotics in the vehicle. Two minutes after the K-9 alerted, Gogebic County dispatch informed Trooper Peterson that they did not want Tadgerson to be transported to jail that evening. The troopers subsequently searched the vehicle and found approximately 200 grams of methamphetamine.[1]

Despite the active outstanding warrants and being the passenger of the drug run, Tadgerson was not arrested and was allowed to leave. She later signed up to be a confidential informant. Several months later, Tadgerson was charged in state court for her involvement in the July 14, 2022 drug run. The charges remain pending.

Trooper Peterson testified that he stopped the vehicle based on reasonable suspicion of criminal activity afoot, Tadgerson's outstanding warrants, and the vehicle crossing the fog line; however, he only noted the fog line traffic infraction in his report. Deputy Detective Harju testified that the decision to stop the vehicle was based on probable cause related to the controlled buys.

---

[1] It is unclear from the record whether any firearm was found in the vehicle.

Detective Sergeant Hyrkas testified that the decision to stop the vehicle was based on probable cause of drug trafficking and methamphetamine in the car.

On July 16, 2022, U.S. Magistrate Judge Maarten Vermaat issued a Criminal Complaint charging Defendant with possession with intent to distribute methamphetamine (ECF No. 1). On August 16, 2022, the grand jury returned a 10-count Indictment against Defendant (ECF No. 14).

On February 22, 2023, the grand jury returned a 16-count Superseding Indictment against Defendant (ECF No. 56). In Count 1, Defendant is charged with conspiracy to distribute and possess with intent to distribute methamphetamine from August 2021 through July 14, 2022. In Counts 2 through 8, Defendant is charged with distribution of methamphetamine on specific dates. In Count 9, Defendant is charged with possession with intent to distribute methamphetamine charges on July 14, 2022. In Counts 10 and 11, Defendant is charged with being a felon in possession of a firearm on July 14, 2022. In Counts 12, 13, and 15, Defendant is charged with obstruction of justice based on phone calls that he made while in jail to one of the confidential informants.[2] In Counts 14 and 16, Defendant is charged with contempt of court for making the calls charged in Counts 13 and 15.

## II. DISCUSSION

In his first motion, Defendant moves to suppress all evidence derived from the July 14, 2022 traffic stop. In his second motion, Defendant asks the Court to sever the obstruction-of-justice and contempt-of-court counts from the gun and drug counts or, in the alternative, a curative jury instruction at trial. The Court addresses each in turn.

---

[2] The government has submitted recordings of the phone calls, which are difficult to understand.

### A. Motion to Suppress

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The government bears the burden of proving that any warrantless search or seizure was reasonable and not in violation of the Fourth Amendment. *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007).

To make a traffic stop, "an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). Here, the government does not defend the traffic stop based on the alleged traffic infraction. Instead, the government contends that the traffic stop did not violate the Fourth Amendment because the officers had reasonable suspicion a drug trafficking crime was occurring and the duration of the stop was reasonable.

Reasonable suspicion is not a particularly difficult threshold to meet. *See United States v McCallister*, 39 F.4th 368, 373 (6th Cir. 2022). It "requires only 'a moderate chance of finding evidence of wrongdoing.'" *United States v. Hilton*, 625 F. App'x 754, 758 (6th Cir. 2015) (quoting *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009)). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (cleaned up). The officer must point to specific, objective facts that give rise to a reasonable suspicion that the person seized was engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). An officer may "draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008). "In considering the totality

of the circumstances, '[the Court] must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)).

The officer's reasonable suspicion need not arise exclusively from his own direct observations. "It is well-established that an officer may conduct a stop based on information obtained by fellow officers." *Lyons*, 687 F.3d at 766. The so-called collective knowledge doctrine "recognizes the practical reality that 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.'" *Id.* at 766 (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)). The collective knowledge doctrine applies when (1) the officer making the traffic stop acts in objective reliance on the information received; (2) the officer providing the information has facts supporting the level of suspicion required; and (3) the stop is no more intrusive than would have been permissible for the officer requesting it. *Id.* at 767. "Reasonable suspicion supporting a traffic stop may ripen into probable cause to search a vehicle based on the officer's interactions with the car's occupants." *Id.* at 764.

Whether the officers here had reasonable suspicion that a drug trafficking crime was occurring is a close call. Investigators had been investigating Defendant for several years. In the months leading up to the traffic stop, investigators used three different confidential informants to buy drugs from Defendant. The confidential informants had shown officers that they were reliable based on the controlled buys and their stories were largely consistent. On July 6, 2022, one confidential informant provided Defendant $1,500 to buy methamphetamine. Another confidential informant said Defendant was thinking about sending him on a drug run. After Tadgerson was arrested, she said she was supposed to go on a drug run with Defendant the next

day to Rhinelander. Tadgerson and the confidential informants were telling officers that Defendant was going to pick up eight ounces or a pound of methamphetamine soon. The record establishes that UPSET knew that a drug run was imminent.

On July 14, 2022, Defendant's phone was tracked leaving the Houghton County area for the first time in days and the phone went directly to Rhinelander. This matches up with what Tadgerson had told the officers—Defendant usually picks up methamphetamine in Rhinelander. The phone stayed there for about an hour, which the detectives said is indicative of drug trafficking based on their experiences. All of this information was communicated by UPSET to HST.

After the vehicle was stopped, Defendant lied about where he came from and never mentioned Rhinelander. Trooper Peterson did not unreasonably delay the traffic stop as he was following his standard procedure for all traffic stops. The K-9 unit arrived a few minutes after the initial stop and alerted to drugs ten minutes after the initial stop. This gave officers probable cause to search the vehicle.

Based on these facts and the totality of circumstances, the Court finds that (1) the HST troopers acted in objective reliance on the information received from UPSET; (2) the UPSET investigators had reasonable suspicion that Defendant was on a drug run and methamphetamine would be found in the vehicle; and (3) the scope and duration of the stop and search were permissible. While this case is not an example of exceptional police work—especially with respect to the inconsistent testimony at the hearing regarding the reasons for making the traffic stop—there was reasonable suspicion to stop the vehicle and the duration of the stop was reasonable.

Accordingly, the Court finds that the officers did not violate Defendant's Fourth Amendment rights and the Motion to Suppress is denied.[3]

### B. Motion to Sever

A motion to sever is governed by Federal Rules of Criminal Procedure 8 and 14. Rule 8(a) permits the joinder of two or more offenses in the same indictment if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a). "Whether joinder was proper under Rule 8(a) is determined by the allegations on the face of the indictment." *United States v. Chavis*, 296 F.3d 450, 456 (6th Cir. 2002). The Sixth Circuit favors joinder, and "the predominant consideration" is judicial efficiency. *Id.* at 460.

Rule 14 permits a district court to grant a motion to sever if the joinder "appears to prejudice a defendant." FED. R. CRIM. P. 14(a). To prevail on a request for severance, the defendant must show compelling, specific, and actual prejudice. *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008). "Even where the risk of prejudice is high, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *Id.* (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

---

[3] The government also attempts to use Tadgerson's outstanding warrants to justify the traffic stop. Generally, police may stop a car if they have reasonable suspicion that a wanted person is in the vehicle. *United States v. Hensley*, 469 U.S. 221, 232-33 (1985). However, the Court finds that the unique set of facts in this case make it unreasonable to rely on the warrants to justify the traffic stop. Having considered the testimony and reviewed the bodycam footage, the Court has serious doubts as to whether the officers ever intended to arrest Tadgerson on the outstanding warrants. The record suggests that Tadgerson was working as an informant the days leading up to July 14, 2022. She continued working as an informant after July 14, 2022. To be clear, this Court's ruling that the traffic stop and subsequent search were reasonable does not rely on Tadgerson's outstanding warrants.

Defendant argues that the obstruction-of-justice and contempt-of-court counts do not relate to the earlier drug and gun charges and the evidence is different. Defendant further contends that he will be unfairly prejudiced if the charges are not severed because the nature of the drug and gun charges may make it more likely for the jury to convict on the obstruction and contempt counts. Defendant lastly contends that his decision as to whether to testify at trial is complicated if the charges are not severed.

Joinder is appropriate under Rule 8(a). The Court agrees with the government that there is substantial overlap in the proofs. Evidence of the drug and gun charges is admissible to prove Defendant's motive for committing the obstruction charges. Joinder of a tampering or obstruction charge with an underlying substantive offense is proper because the former is "connected to, and interrelated with," the latter. *United States v. Little Dog*, 398 F.3d 1032, 1037 (8th Cir. 2005); *see also United States v. Murphy*, 836 F.2d 248, 255 (6th Cir.1988) ("Had the defendant sought and obtained a severance of the obstruction and perjury charges from the mail fraud charges, the evidence of defendant's conduct which formed the basis of the mail fraud prosecutions would have been admissible under the provisions of Evidence Rule 404(b) to set in proper perspective the defendant's conduct as it related to the obstruction and perjury charges."). The Court is not persuaded by Defendant's argument to the contrary.

In addition, Defendant has not met his burden of demonstrating compelling, specific, and actual prejudice. Because evidence pertaining to both counts likely would be admissible in separate trials, Defendant cannot show actual prejudice. Moreover, Defendant's vague statement about the prejudice for having to choose to testify as to all counts falls well short of the required "convincing showing that he has both important testimony to give concerning one count and a

11

strong need to refrain from testifying on the other." *United States v. Bowker*, 372 F.3d 365, 385 (6th Cir. 2004) *vacated on other grounds*, 543 U.S. 1182 (2005).

Although the Court believes that a curative instruction will likely be appropriate at trial, the Court will refrain from ruling on this issue at this time. The Court believes this issue is better addressed closer to trial and Defendant may renew his request for a curative instruction at that time.

### III. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress (ECF No. 69) and Motion to Sever (ECF No. 70) are DENIED.

Dated:  August 7, 2023                                           /s/ Janet T. Neff
                                                                                         JANET T. NEFF
                                                                                         United States District Judge