UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

GREGORY JAMES KNUUTTILA

    Defendant.
_____/

No.   2:22-CR-15

HON. JANET T. NEFF
U.S. District Judge

## GOVERNMENT'S SENTENCING MEMO

### Background

From 1996, when he was 17, until his arrest in this case, Defendant Gregory James Knuuttila was in near continuous contact with the criminal justice system. By 2020, he was distributing methamphetamine in the Upper Peninsula's Copper Country. (R.109, PSR, PageID.678.) In September 2020, investigators seized 193.77 grams of methamphetamine from a car Defendant was travelling in with two others. (*Id*.)

From September 2020 until July 14, 2022, Defendant continued trafficking methamphetamine in the Upper Peninsula. (*Id*. at 677–79; 681–86.) Per the presentence report, at least eleven individuals provided information to law enforcement about Defendant's involvement in methamphetamine trafficking during that period. (*Id*.) Some of those individuals also discussed Defendant's possession of firearms during his drug-trafficking. (*Id*. at 681–84, 687.) One individual

1

discussed acting as Defendant's "muscle" and said that Defendant threatened to shoot people.  (*Id.* at 684.)

Throughout the first half of 2022, investigators conducted ten controlled buys for methamphetamine into Defendant.  (*Id.* at 678–81.)  Then on July 14, 2022, investigators apprehended him in a car with 193 grams of methamphetamine.  (*Id.* at 682.)  During the execution of a search warrant at a house Defendant resided in, investigators found two firearms: a .22 caliber Beretta pistol and a 9mm Smith & Wesson pistol.  (*Id.* at 683.)  And based on information from the other person (JT) in the car with 193 grams of methamphetamine, investigators searched a Honda Element and found another firearm that JT said belonged to Defendant.  (*Id.*)

After Defendant was charged in an indictment with multiple federal crimes, Defendant proceeded to attempt to tamper with witnesses from jail.  He called JK and told her to "work" a confidential informant.  (*Id.* at 687–88.)  He called TK and told him to go catch some of the people that had conducted buys into him.  (*Id.* at 688.)  He called JC (a confidential informant) to tell JC that Defendant knew he was involved, asking JC about whether he was going to show up at trial, and explaining that if people don't show up to trial, Defendant would win.  (*Id.*)  He called JT and confronted her about cooperating with police.  (*Id.*)

Based on this conduct, the government sought, and the Court issued, an order barring Defendant from contacting witnesses in the case.  (*Id.*)  But Defendant continued to call witnesses and badger them, including JC.  Defendant called JC multiple times, told JC not to bury Defendant, and repeatedly asked if JC was going

to go to trial.  (*Id.* at 688.)

Defendant was charged in a superseding indictment with conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, one count of possession with intent to distribute 50 grams or more of methamphetamine, two counts of distribution of 5 grams or more of methamphetamine, five counts of distribution of an unspecified amount of methamphetamine, two counts of possession of a firearm, three counts of obstruction of justice, and two counts of contempt of court.  (*Id.* at 672–73.)  He ultimately pleaded guilty to Count 9: possession with intent to distribute 50 grams or more of methamphetamine, and the government agreed to dismiss the remaining counts of the indictment at the time of sentencing.  (*Id.* at 674.)

Sentencing is set for January 25, 2023.  The government asks for a within-guidelines sentence.

**The Presentence Report**

A probation and pretrial services officer prepared a presentence report.  The probation officer scores the base offense level as 34 under USSG § 2D1.1(a)(5), (c)(3), based on the methamphetamine recovered from cars Defendant occupied on September 24, 2020, and July 14, 2022, as well as weight discussed by cooperators.  (*Id.* at 692–93.)  Defendant objects to all but the weight recovered from the car on July 14, 2022, which if followed would result in a base offense level of 26 after accounting for the Court's policy disagreement with the guidelines.  (*Id.* at 732–33.)  The probation officer scores two-level enhancements for possession of a firearm and

for Defendant directing the use of violence. (*Id.* at 733.) Defendant objects to these enhancements. He claims the firearms found were not his and that the evidence in support of his directing the use of violence is unreliable. (*Id.* at 733, 734.) The probation officer then scores a two-level enhancement for obstruction of justice under USSG § 3C1.1. (*Id.* at 693.) The probation officer scores the adjusted and total offense levels as 40, recommending against acceptance of responsibility under USSG § 3E1.1. Specifically, the probation officer concludes acceptance is not appropriate because Defendant denies much of the relevant conduct in this case, because of Defendant's obstructive conduct, and because Defendant attempted to have suboxone sent to him in the jail to sell. (*Id.* at 735–36.) Defendant sent JT an attorney envelope to attempt to subvert the jail's inspection process. (*Id.* at 675.) Defendant objects to the recommendation to deny him acceptance of responsibility. (*Id.* at 735.)

Probation then outlines Defendant's extensive criminal history. Excluding juvenile adjudications, his first convictions occurred in 1996 when he was 17. That year, he received three convictions, including a burglary conviction. (*Id.* at 694–95.) Over the nearly three decades that follow, he incurred twenty-three additional convictions ranging from the minor (e.g., unlawful consumption of a minor and loitering) to the serious (e.g., robbery, breaking and entering, and assault with a dangerous weapon). (*Id.* at 695–709.) He was either in custody or under the supervision of a court for nearly all the time since 1996. Based on the government's review, he was not in custody or on probation between March and August 2015 and March and August 2016, though he was likely on pretrial release. (*Id.* at 704–06.)

4

Otherwise, since 1996, he was either in custody or on some form of probation. (*Id.* at 695–709.)   He has served multiple prison sentences and struggled with misconducts in prison and parole conditions while out.   (*Id.* at 697–700.)   He has also struggled with complying with probation conditions throughout his long history with the criminal justice system.   (*Id.* at 695–709.) He has convictions for violent offenses beyond those noted above, including aggravated assault and domestic violence.   (*Id.* at 697–98.)

Based on Defendant's prior convictions, probation scores 14 criminal history points.   (*Id.* at 710.)   Probation correctly concludes that Defendant receives only four points for his one-point offenses under USSG § 4A.1(c), even though he would otherwise receive seven points.   Defendant objects to the scoring of a 2011 one-point offense for assault and battery because he says it is outside the ten-year look back period.   (*Id.* at 703–04.)   However, if excluded it would only result in another one-point offense being scored; the objection thus does not alter the criminal history score.   (*Id.* at 736.)   Defendant receives an additional point for being under a criminal justice sentence at the time he committed the instant offense.   (*Id.* at 711.) With a total criminal history score of 15, his criminal history category is VI.

With a guidelines range of 40-VI, his guidelines range is 360 months to life. (*Id.* at 727.)   However, based on the Court's policy disagreement with the guidelines, the base offense level is 32 resulting in a total offense level of 38 and a guidelines range of 360 months to life.   (*Id.* at 731.)

5

**Defendant's Objections**

1. **The Base Offense Level**

Defendant argues that the statements of cooperators and others are unreliable and that, as a result, the Court should not rely on them. (R.109, PSR, PageID732.) Before addressing why those statements are reliable, the government explains why the statements qualify as relevant conduct.

   *a. The Witness Statements Qualify as Relevant Conduct.*

Under § 1B1.3(a)(2), the quantity of drugs attributable to a defendant includes relevant conduct, including amounts "that were part of the same course of conduct . . . as the offense of conviction." *See also United States v. Gonzales*, 929 F.2d 213, 215–16. (6th Cir. 1991). The government has the burden of establishing relevant conduct by a preponderance of the evidence. *Id.* at 216. The Court may find the methamphetamine from the traffic stop was relevant conduct under two alternative theories. The first is where the offenses are "part of a common scheme or plan" and the second is where the offenses are part of the same course of conduct. *United States v. Benton*, 957 F.3d 696, 701 (6th Cir. 2020). Either alone is sufficient. *United States v. McCloud*, 935 F.3d 527, 533 (2019). Here, however, the additional drug-trafficking activity is considered relevant conduct under both.

"Offenses 'qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.'" *Id.* (quoting U.S.S.G. § 1B1.3 cmnt. n.5(B)(ii)). "The three factors relevant to determining whether offenses are

sufficiently related to constitute the 'same course of conduct' include 'the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.'" *United States v. Hill*, 79 F.3d 1477, 1481-82 (6th Cir.1996) (quoting USSG § 1B1.3, cmnt. n. 9). "The commentary requires courts to balance these factors such that 'when one of [these] factors is absent, a stronger presence of at least one of the other factors is required.'" *Id*.

The Sixth Circuit has elaborated on how these principles are applied. In *United States v. Faison*, 339 F.3d 518 (6th Cir. 2003), the defendant argued that a fourteen-month lapse between the end of charged cocaine distribution conspiracy and the later discovery of two pistols and drug proceeds in the defendant's possession precluded a finding that his possession of the drug proceeds and firearms were relevant conduct to the conspiracy. This Sixth Circuit disagreed, noting that the drug proceeds, which Faison admitted were either from cocaine sales or would be used to purchase cocaine, demonstrated that he was a continuing cocaine trafficker. *Id*. at 521. This continuing cocaine trafficking "constitute[d] the same course of conduct and ha[d] a common purpose as his offense of conviction." *Id*.

In *United States v. Gilbert*, 173 F.3d 974 (6th Cir. 1999), the district court found that defendant's possession of crack cocaine in February 1993 and December 1994 qualified as relevant conduct in relation to an August 7, 1996, arrest for distributing crack cocaine. *Id*. at 976-78. The Sixth Circuit upheld the decision of the district court, pointing to the "consistent pattern of acquiring, packaging, and distributing crack cocaine" established by defendant in the years before his arrest.

*Id.* at 978. The court found strong evidence that the earlier transactions were part of the same continuous course of conduct as the offense charged in the indictment, observing that the transactions "all involved the same gang, the same type of drug, the same general location, and the same modus operandi." *Id.*

Here, as in *Gilbert* and *Faison*, the conduct qualifies as part of the same course of conduct. Like in *Gilbert*, in assessing the similarity, there is a common purpose and similar modus operandi between the drug-related conduct in this case. *Id.* (quoting U.S.S.G. § 1B1.3 cmnt. n.5(B)(i)). Defendant had the same purpose—to distribute methamphetamine—for all his offenses, charged or not. All the offenses centered around the Upper Peninsula's Copper Country.

It is not merely the same drug, but distribution in the same community involving the same subjects. *Cf. United States v. Ridley*, 9 F. App'x 445, 448 (6th Cir. 2001) (finding conduct in 1998-1999 qualified as relevant conduct to offense of conviction from March and April 1999 where same drug, same source, and same community were involved). Defendant's charged and uncharged offenses were thus part of a "steady, continuous pattern" of distributing and attempting to distribute methamphetamine. *See United States v. Easley*, 306 F. App'x 993, 996 (6th Cir. 2009).

Moreover, even viewing the evidence in the light most favorable to Defendant, the offenses are separated by less than two years. And on a sliding scale, the strong evidence of both similarity and regularity compensates for weaker evidence of temporal proximity. *United States v. Phillips*, 516 F.3d 479, 483–85 (6th Cir. 2008).

As noted by the Sixth Circuit in *Benton*, the simultaneous possession and sale of drugs over several years "is a paradigmatic example of ongoing criminal conduct." *Benton*, 957 F.3d at 703. As a result, Defendant's additional drug trafficking activity qualifies as part of a single course of conduct.

### b. *The Statements Are Reliable and Credible.*

So long as the evidence in the presentence report bears "some minimal indicia of reliability in respect of defendant's right to due process," the Court may consider the evidence. *United States v. Herrera*, 928 F.2d 769 (6th Cir. 1991). As the Seventh Circuit has observed, "the court may rely on a PSR containing hearsay, so long as those statements are reliable." *United States v. Harmon*, 721 F.3d 877, 889 (7th Cir. 2013) (cleaned up). "'Indicia of reliability' may come from, inter alia, the provision of facts and details, corroboration by or consistency with other evidence, or the opportunity for cross-examination." *Id.* (quoting *United States v. Smith*, 674 F.3d 722, 732 (7th Cir. 2012)).

The government may withhold a CI's identity when there is good cause for doing so, and the Court may rely on that evidence so long as there is sufficient corroboration. *United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019). There are two CIs identified in the Presentence Report, who provided statements against Defendant. The first, discussed at paragraphs 49 and 52, is JC, who is also discussed at paragraph 55. (R.109, PSR, PageID.681–83.) The government asked that the report reflect their actual name without objection (R.105, Obj. Ltr., PageID.659), but with all the other changes, the requested change was unfortunately

9

missed.   The identity of the other CI discussed at paragraphs 60–69 was withheld to protect their identity.   (R.109, PSR, PageID.684–85.)   Defendant was not aware of the person's identity as a cooperator.   Further, based on Defendant's obstructive behavior and the death of two CIs related to the case, the government submits there is good cause for not disclosing the identity—specifically, protecting the CI from harassment and harm.

The burden of showing sufficient corroboration for a CI's statement is not high: "'Sufficient' means just that: sufficient. It does not mean exhaustive. It does not mean perfect. It's enough corroboration to satisfy the indicia-of-reliability standard, a standard lower than even a preponderance of evidence." *Armstrong*, 920 F.3d at 399.   Even an unidentified informant's claims meet this standard "when the district court can reasonably corroborate enough of the information to make a general finding about the informant's reliability." *Id*. The government does not need to corroborate all claims even when made by a confidential informant.   *Id*.

Probation scores methamphetamine based on the September 2020 traffic stop; the proffer of SB; the statements of JC; the July 14, 2022 traffic stop; the statements of a CI from November and December 2022; and the interview and proffer of JS.

Here, there is sufficient corroboration to rely on the various sources.   As a preliminary matter, the investigation in conjunction with the various statements paint the same picture: that Defendant was consistently obtaining and distributing large quantities of methamphetamine in the Copper Country.

Regarding the September 2020 traffic stop, Defendant was pulled over with

two others in a car with methamphetamine. (R.109, PSR, PageID.676.) Then, one of the occupants of the car confirmed that Defendant went on the trip to get drugs and that Defendant was getting a third of the methamphetamine from that trip. (*Id.*) Another individual said that Defendant stopped going on trips after the September 2020 traffic stop, preferring to send others to get methamphetamine. (*Id.* at 685.)

Regarding SB's statements, though the specific weights he discusses are not corroborated by others, SB says that Defendant became upset with SB after SB distributed to AL. (*Id.* at 677.) AL later admitted to investigators that he got methamphetamine from Defendant. (*Id.* at 681.)

Regarding the statements of JC and the CI, both discuss Defendant having firearms. (*Id.* a 681, 685.) They also both discussed seeing Defendant with larger quantities of methamphetamine—JC said it was a half-pound, and the CI said he saw Defendant with a quarter pound but believed Defendant possessed as much as a half-pound of methamphetamine at a time. (*Id.*)

Similarly, the CI corroborates the statements of JS. The CI said that Defendant switched to JT's source in Wisconsin. (*Id.* at 685.) The CI also said that Defendant was getting close to eight ounces of methamphetamine a trip. (*Id.*) JS confirmed that they provided Defendant and JT methamphetamine in Wisconsin on July 14, 2022, and JS also explained that he had supplied JT and Defendant with methamphetamine for months at the time of the traffic stop. (*Id.* at 683, 686–87.) JS said Defendant was getting eight ounces to two pounds of methamphetamine at a

11

time. (*Id*. at 686–87.) Investigators found the methamphetamine in the car on July 14, 2022, after Defendant and JT made a quick trip to Rhinelander, Wisconsin. Defendant and JT's trip corroborates the information provided by both the CI and JS.

JT and ST further corroborated the information. JT said she and Defendant had gotten the methamphetamine from JS on July 14, 2022. (*Id*. at 682.) And like the CI, ST said that Defendant changed sources at some point to JT's source in Wisconsin, which describes JS. (*Id*. at 685–86.)

The various statements are further corroborated by the information provided by ST, as well as information from AL, KY, and AS. All admitted to receiving methamphetamine from Defendant. ST said she was receiving one to two ounces of methamphetamine at a time over twenty to fifty deals. (*Id*. at 685.) AL admitted to trading a gun to Defendant in exchange for drugs. (*Id*. at 681.) KY and AS both described getting methamphetamine from Defendant while Defendant was possessing a firearm. (*Id*. at 686.)

Against the backdrop of the two traffic stops and ten controlled buys, the various statements are credible and reliable. The government concedes, however, that some of the methamphetamine attributed by JC and the CI likely came from JS. To avoid double counting, the government recommends excluding that weight. Accounting for the Court's policy disagreement with the guidelines, the total converted drug weight would be 4,778.38 kilograms of converted drug weight instead of 6,139.16 kilograms of converted drug weight:

| Source of Information | Substance | Amount | CDW | CDW 1:1 Ratio | CDW 1:1 Excluding CI and JC |
|---|---|---|---|---|---|
| 9/24/2020 Traffic Stop | Methamphetamine Actual | 184.47g | 3689.38kg | 368.94kg | 368.94kg |
| SB Proffers | Methamphetamine | 197.10g | 394.19kg | 394.19kg | 394.19kg |
| JC Statements | Methamphetamine | 453.59g | 907.18kg | 907.18kg | 907.18kg |
| 7/14/2022 Traffic Stop | Methamphetamine Actual | 193.25g | 3865.08kg | 386.51kg | 386.51kg |
| CI Statements | Methamphetamine | 226.80g | 453.59kg | 453.59kg | 453.59kg |
| JS Statements | Methamphetamine | 1814.37g | 3628.74kg | 3628.74kg | 3628.74kg |
| Total | | | 12938.17kg | 6139.16kg | 4778.38kg |

### 2. The Firearm Enhancement Applies

The government believes Defendant is arguing the Court should not rely on the statements because he claims (a) they lack reliability rather than claiming the statements were not made and (b) the guns found at Stanton Ave. belonged to JC not Defendant. (*Id.* at 733.)

Under USSG § 2D1.1(b)(1), a district court should apply a two-level enhancement to the offense level "[i]f a dangerous weapon (including a firearm) was possessed." The enhancement applies where the government establishes by a preponderance of the evidence "that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense." *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996) (citation and internal quotation marks omitted)). But "the offense" is interpreted broadly to include relevant conduct. *Id.* at 188. Thus, the enhancement scores so long as Defendant possessed a firearm during an act or omission that was "'part of the same course of conduct or common scheme or plan as the offense of conviction.'" *Id.* (quoting USSG

13

§ 1B1.3(a)(2)). Once the government has made this showing, the burden switches to the defendant to show that it was "clearly improbable" that the possession was related to the offense. *Id.* at 188; USSG § 2D1.1 cmnt. n.11(A).

Here, multiple witnesses said Defendant possessed a firearm during relevant conduct. (R.109, PSR, PageID.733.) And those witnesses' statements corroborate each other and are consistent with the evidence seized by investigators. AL said he traded a gun for drugs with Defendant. (*Id.* at 681.) (*Id.*) JC said that Defendant had three firearms, including a .22 caliber Beretta pistol, a silver 9mm pistol, and a .22 caliber Smith & Wesson pistol." (*Id.* at 683.) Two firearms matching the description were found with Defendant's clothes and personal effects at JC's residence, and the third was found in JT's vehicle. (*Id.*) JT said the firearm in her vehicle belonged to Defendant. (*Id.* at 682, 683.) The CI said that Defendant had traded firearms for methamphetamine in the past. (*Id.* at 684.) KY and AS each said they saw Defendant with a firearm during a drug deal on different occasions. (*Id.* at 686.) JS also connected Defendant to firearms during relevant conduct, including a .22 caliber handgun. (*Id.* at 687.) The statements and recovered evidence point to the same conclusion: Defendant possessed firearms during relevant conduct. The government submits the two levels are appropriately scored.

### 3. Defendant Directed the Use of Violence

Under USSG § 2D1.1(b)(2), a defendant receives a two-level enhancement if he "used violence, made a credible threat to use violence, or directed the use of violence."

The CI reported that they acted as muscle for Defendant, threatened people

14

for Defendant, and slapped people over drug debts. (R.109, PSR, PageID.684.) Though no other report specifically corroborated this statement, that is not necessary. *Armstrong*, 920 F.3d at 399. Rather, the focus is on whether the CI's statement overall is sufficiently corroborated by other evidence. *Id.* It is. The CI said that Defendant was distributing methamphetamine, which is consistent with what all the people providing information said. (R.109, PSR, PageID.676–78, 681, 683–87.) The CI also said that Defendant had firearms, which is consistent with what AL, JS, JT, JC, KY, and AS said about Defendant. (*Id.* at 681, 683–87.) The CI also said that he slapped AL for Defendant; and AL said that he got methamphetamine from Defendant. (*Id.* at 681, 684.) The CI talked about Defendant working with JT and going to JT's source in Wisconsin to get methamphetamine. (*Id.* at 685.) That is consistent with what ST, JT, and JS said about Defendant's dealings with JS. (*Id.* at 683, 685–87.) The evidence sufficiently corroborates the CI's statements. The government submits that the enhancement is appropriately scored.

**4. Defendant's Denial of Relevant Conduct and Attempt to Smuggle Suboxone Warrant Denial of Acceptance of Responsibility**

Under USSG § 3E1.1, "if the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." Even when a defendant pleads guilty, acceptance of responsibility is not always appropriate. For example, where a defendant frivolously denies relevant conduct, the Court has discretion to deny acceptance of responsibility. *United States v. Smith*, 782 F. App'x 383, 390 (6th Cir. 2019); *United States v. Miller*, 45 F. App'x 359, 364 (6th Cir. 2002);

15

USSG § 3E1.1, cmnt. n. 1(A). The Application Notes to § 3E1.1 also direct the district court to consider whether there was "voluntary termination or withdrawal from criminal conduct or associations." USSG § 3E1.1 cmnt. n. 1(A), (B). And ordinarily, where a defendant receives an enhancement under USSG § 3C1.1 for obstruction of justice, acceptance of responsibility is not appropriate. USSG § 3E1.1, cmnt. n. 4.

Per the plea agreement, the government agreed not to oppose Defendant's request for acceptance of responsibility under USSG § 3E1.1 unless it subsequently learned of conduct inconsistent with the criteria set forth under USSG § 3E1.1.

But then Defendant engaged in conduct inconsistent with acceptance of responsibility. Defendant denied most of the relevant conduct offered by witnesses, even though, as described above, the witness statements are reliable and credible. Based on his frivolous denial of relevant conduct, and his other post-charge conduct, the Court should deny Defendant acceptance of responsibility.

And his denial of relevant conduct needs to be viewed against his prior post-charge conduct. Defendant obstructed justice by contacting witnesses from the jail, even after he was barred from doing so by the Court. Under the guidelines, that would limit application of § 3E1.1 to "extraordinary cases." USSG § 3E1.1 cmnt. n. 4.

Defendant then attempted to distribute drugs from Newaygo County Jail, reflecting a lack of voluntary termination or withdrawal from criminal conduct. The Sixth Circuit has held that subsequent criminal conduct may be relevant to

16

acceptance of responsibility if it is "of the same type as the underlying offense, . . . the motivating force behind the underlying offense, . . . related to actions toward government witnesses concerning the underlying offense, . . . [or] involve[s] an otherwise strong link with the underlying offense." *United States v. Morrison*, 983 F.2d 730, 735 (6th Cir. 1993). When, like here, a defendant distributes controlled substances while incarcerated pending disposition of the case, the Court has discretion to deny acceptance of responsibility where the underlying offense was for distribution of controlled substances. *United States v. Dugger*, 485 F.3d 236, 240 (4th Cir. 2007). Though different substances were involved in the offenses, that does not preclude denying acceptance of responsibility. *See id.* at 238, 240 (denying acceptance of responsibility where defendant pleaded guilty to distribution of cocaine base and then engaged in a scheme to distribute Xanax and marijuana from the jail).

### 5. Defendant's Conviction for Assault and Battery Properly Scores Criminal History Points

Defendant claims the assault and battery conviction in paragraph 141 of the presentence report should not score because it is outside the ten-year look back period of USSG § 4A1.2(e)(2). (*Id.* at 736.) During the objection meeting, however, Defendant conceded that if the Court finds the September 2020 traffic stop and/or conduct occurring on or before November 9, 2021, are relevant conduct, then the Court should score the prior conviction. (*Id.*) *See United States v. Oliver*, 129 F. App'x 210, 212 (6th Cir. 2005). As discussed above, the government believes that the September 2020 traffic stop qualifies as relevant conduct. The government recognizes, however, that if the Court finds that there is no relevant conduct on or

17

before November 9, 2021, then the offense in paragraph 141 does not score.

### 6. Location of Other Criminal Conduct in the Presentence Report

The government defers to the Court and the probation officer on where the information currently located under "Other Criminal Conduct" should be placed in the presentence report.

## § 3553(a) Analysis

Defendant was responsible for bringing a large quantity of methamphetamine to the Upper Peninsula. While engaging in that effort, he threatened people and had at least one other person rough people up for him. And then when he was charged, he proceeded to attempt to obstruct justice by contacting witnesses in his case and continued to do so after a court order directed him to stop. Regardless of how the Court rules on the pending objections, Defendant's offense conduct was very serious. Based on the seriousness of that offense, there is a need to deter others from engaging in criminal conduct, a need to promote respect for the law, and a need to provide just punishment for the offense.

But even more than the offense conduct, Defendant's history calls for a substantial sentence. As outlined in some detail above, Defendant has shown he is incapable of following the law. Year after year, he violated the law; year after year, he ended up on probation or in custody; and year after year, he did poorly while in custody or on probation. Since 1996, he has almost constantly been in custody or under the supervision of a court, and yet, nothing has dissuaded him from continuing to violate the law. Defendant's history of violent convictions (including assault with

18

a dangerous weapon, robbery, and aggravated assault) establish a particular need to protect the public from him. The greatest predictor of the future is the past, and Defendant's past shows that he will continue to violate the law whenever he is released from custody.

The sentencing guidelines call for a significant sentence of 360 months to life. Based on Defendant's long history within the criminal justice system and his offense, the government submits that a sentence within that range is appropriate.

          MARK A. TOTTEN,
          United States Attorney

Dated: January 11, 2024   /s/ Theodore J. Greeley
          THEODORE J. GREELEY
          Assistant United States Attorneys